IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANET ERB,                              :
                Plaintiff           :
                                    :
      v.                              :      3:CV-07-1961
                                      :      (JUDGE VANASKIE)
BOROUGH OF CATAWISSA, EDWARD            :
RHOADES, GEORGE ROMANIA,                :
BARBARA REESE, DOROTHY LINN,            :
DONALD STEWART, JOHN SABOL,             :
LINDA KASHNER, MAYOR HAROLD             :
KITCHEN,                                :
                Defendants          :

MEMORANDUM

      This action arises out of Plaintiff Janet Erb's alleged wrongful discharge from her position as Secretary for the Borough of Catawissa. In her Sixteen Count Complaint, she asserts constitutional and state law claims against the Borough of Catawissa, Borough of Catawissa Council Members Edward Rhoades, George Romania, Barbara Reese, Dorothy Linn, Donald Stewart, John Sabol, Linda Kashner, and Borough of Catawissa Mayor Harold Kitchen. Specifically, she claims Defendants violated her First and Fourteenth Amendment rights under the United States Constitution; wrongfully terminated her; committed actual fraud, defamation, invasion of privacy, and false light; intentionally caused her emotional distress; discriminated against her, and discharged her in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the Pennsylvania Human Relations

Act ("PHRA"), 43 Pa. Cons. Stat. § 951, et seq.[1]

Defendants have moved for partial dismissal of Ms. Erb's claims. (Dkt. Entry 44). For the reasons set forth below, Defendants' Motion will be granted as to Plaintiff's official capacity claims against the individual Defendants (Counts III and V), wrongful termination claim (Count VII), and defamation, invasion of privacy, false light , and intentional infliction of emotional distress claims (Counts IX, X, & XIII). Defendants' Motion will be denied in all other respects.

I. BACKGROUND

Janet Erb obtained employment with the Borough of Catawissa on May 4, 1994. (Second Am. Compl., Dkt. Entry 42, at ¶ 20.) It is alleged that she performed her work in a good, professional, and competent manner. (Id. at ¶ 21.)

On April 26, 2007, Defendants Reese and Linn, Members of the Borough Council of Catawissa, allegedly informed Ms. Erb that she would be discharged from her employment if she did not quit. (Id. at ¶ 22.) She was also told that if she resigned, she would provided with certain benefits in the form of a severance package. (Id. at ¶ 27.) Reese and Linn supposedly presented Ms. Erb with a written statement detailing the specific severance benefits to which

---

[1]For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's electronic record and to authority cited herein have been created. No endorsement is intended by the insertion of hyperlinks to a particular provider of authority in electronic format. Also for convenience, references to the Second Amended Complaint and the parties' briefs will be to the document number and pagination generated by the electronic case filing system ("CM/ECF") listed at the top of each page of the documents filed by the parties, rather than to the exhibit number or deposition transcript used by the parties.

she was entitled.  (Ex. A, Dkt. Entry 2.)  It said:

> Catawissa Borough Council has become aware of changes in your performance and has unanimously decided to provide you with a retirement severance package, which will include the following:
>
> 1.  May 4, 2007, will be the last day you are physically in the Borough office.  You will continue to be a Catawissa Borough employee until May 31, 2007.  From May 4, 2007, through May 31, 2007, you will utilize 17 vacation days and one personal day.
>
> 2.  Two months severance pay starting June 1, 2007, and continuing through July 31, 2007.  The Borough will continue to pay your medical insurance through that period.
>
> 3.  You will be responsible for payment of medical insurance starting August 1, 2007.  You will continue as a retired member of the Borough's medical insurance plan, provided this benefit can be offered without cost to the Borough.
>
> 4.  It is also understood that this offer is made in good faith and if not accepted your employment will be terminated at a public meeting on May 7, 2007.

(Id.)

The Second Amended Complaint alleges that, before offering Ms. Erb this severance package, Defendants Rhoades, Romania, Rees, Linn, Stewart, Sabol, Kashner, and Mayor Kitchen met and agreed to terminate Ms. Erb's employment.  (Second Am. Compl, at ¶ 23.)  It is further alleged that this decision was never ratified by the Borough Council of Catawissa at a proper meeting open to the public.  (Id. at ¶ 25.)  Romania, Stewart, Sabol, Rhoades, Kashner, and Kitchen allegedly authorized Reese and Linn to inform Ms. Erb that she would be discharged unless she resigned.  (Id. at ¶ 26.)  Defendants were allegedly motivated to

terminate Ms. Erb in order to create a vacancy in the position of Borough Secretary, which would enable the hiring of Kimberly Rhoades. (Second Am. Compl, Dkt. Entry 42, at ¶ 29.) Kimberly Rhoades is the wife of Defendant Edward Rhoades.[2] (Id. at ¶ 30.)

The Second Amended Complaint alleges that Ms. Erb engaged in constitutionally protected conduct in declining to give allegiance to the public officials, political parties, and political factions in power in the Borough of Catawissa.[3] (Id. at ¶ 32.) This conduct is purported to be a substantial and motivating factor in the Defendant's adverse employment action. (Id. at ¶ 33.)

Ms. Erb resigned on May 3, 2007. (Second Am. Compl, Dkt. Entry 42, at ¶ 34.) On May 8, 2007, the council members voted at an open meeting to accept Ms. Erb's resignation, but supposedly refused to provide her the benefits of the severance package. (Id. at ¶ 35.) Mayor Kitchen is alleged to have participated with the others in reaching the decision to accept Ms. Erb's resignation while refusing her benefits, in personally directing the action, or at least having knowledge of the scheme and acquiescing to the action. (Id. at ¶ 36.)

It is alleged that the termination of Ms. Erb's employment by Defendants was pursuant to a policy and custom of the Borough of Catawissa because those with the final authority to

<hr />

[2]Ms. Erb was born on May 6, 1949. (Second Am. Compl, Dkt. Entry 42, at ¶ 19.) Mrs. Rhoades was younger than Ms. Erb. (Id. at ¶ 54.)

[3]According to the Second Amended Complaint, the position of Borough Secretary for the Borough of Catawissa is not a position that requires political affiliation. (Second Am. Compl., at ¶ 31.)

establish a municipal policy terminated Ms. Erb. (Id. at ¶ 61.)  Following the termination of Ms.

Erb, the council members voted to hire Kimberly Rhoades as the Borough Secretary. (Id. at ¶

39.)

The Second Amended Complaint alleges that, subsequent to the meeting on May 8,

2007, Defendants created negative publicity about Ms. Erb in the local newspapers and other

media, suggesting that she quit her employment without notice. (Id. at ¶ 43.)  The publicity

allegedly "created the clear inference that she had abandoned her job without notice, without

consideration of her duties as a public officer, without justification, without concern for the

community or the taxpayers, and with the implication of some form of wrong doing on her part."

(Id. at ¶ 97.)  Defendants supposedly knew that such publicity was false. (Id. at ¶ 45.)  Ms. Erb

claims this caused her great harm, inconvenience, and emotional distress, as well as damaged

her reputation. (Id. at ¶ 50.)

Counts I and V of the Second Amended Complaint allege violations of the First and

Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983

against all Defendants.[4] (Second Am. Compl., at pp. 10 & 16.) Specifically, Ms. Erb alleges

that her termination was a violation of her constitutionally protected right of speech and

association. (Id. at ¶ 64.)  Count VI alleges the same violation against the eight individual

_____

[4]Counts I, II, XI, XII, XIV, and XV contain allegations against the Borough of Catawissa.
Counts III, IV, V, VI, VII, VIII, IX, X, XIII and XVI contain allegations against the remaining eight
Defendants.

Defendants, but also claims that the individual Defendants knowingly and maliciously deprived Ms. Erb of her civil rights. (Id. at ¶ 84.)

Counts II, III, and IV allege violations of Procedural Due Process under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 against all Defendants. (Second Am. Compl., at p. 11.) Defendants are alleged to have disseminated false and defamatory information about Ms. Erb in violation of her protected liberty interest. (Id. at ¶¶ 67-68, 73-74.) It is additionally alleged that the Borough of Catawissa terminated her without a pre-termination hearing. (Id. at ¶¶ 69, 75.)

Count VII alleges a Wrongful Termination claim against the eight individual Defendants under Pennsylvania common law in violation of public policies prescribed in 42 Pa. Cons. Stat. § 8550, 53 Pa. Cons. Stat. § 45101, et seq. ("The Borough Code"), and the Pennsylvania Sunshine Act, 65 Pa. Cons. Stat. § 701, et seq. (Id. at pp. 19-21.) Specifically, it is alleged that the individual Defendants engaged in fraudulent and malicious conduct to deprive Ms. Erb of her employment and reputation without a proper hearing in violation of the public policies of the Commonwealth of Pennsylvania. (Id. at ¶¶ 85-93.)

Count VIII alleges that, in failing to honor the severance package, the eight defendants committed actual fraud. (Id. at ¶¶ 94-95.) Count IX asserts a claim of Defamation against the eight individual Defendants for communications disseminated in the newspapers stating that Ms. Erb abandoned her job. (Id. at p. 23.) Count X asserts claims of false light and invasion of

privacy against the eight individual Defendants for the alleged offensive communications about Ms. Erb's resignation. Counts XI and XII allege the Borough of Catawissa violated the ADEA in wilfully, knowingly, and intentionally discriminating against her on account of age and constructively discharging her. (Id. at ¶¶ 106-09, 112-13.) Count XIII asserts a claim of intentional infliction of emotional distress against the eight individual Defendants. (Id. at ¶¶ 114-15.) And finally, Counts XIV, XV, and XVI allege violations of the PHRA for discrimination on account of age and constructive discharge against all Defendants. (Id. at ¶¶ 116-18, 120-24.)

II. DISCUSSION

    A. Standard of Review

In order to state a claim for relief, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ---- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Id. (internal

citations omitted).

The United States Supreme Court in <u>Twombly</u> enunciated a two-pronged approach to motions that challenge the viability of a complaint. <u>Iqbal</u>,129 S. Ct. at 1950 (citing <u>Twombly</u>,550 U.S. at 555-56). First, a court considering a motion to dismiss identifies "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u> A plaintiff must present factual allegations that nudge the "claims across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570.

B.  Procedural Due Process Claim

The Fourteenth Amendment of the Constitution forbids a state from depriving persons of "life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1.  "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" Fuentes v. Shevin,  407 U.S. 67, 80-81 (1972).  "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" Id. (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  The United States Supreme Court has described this constitutional right to notice and an opportunity to be heard in the following manner:

8

> The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decision making that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. It has long been recognized that 'fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . (And n)o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170-172, 71 S.Ct. 624, 647, 95 L.Ed. 817 (Frankfurter, J., concurring).

Id. at 81.  When a plaintiff claims that a state actor failed to provide procedural due process, a familiar two-stage analysis is employed: (1) whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of "life, liberty, or property"; and if protected interests are implicated, (2) whether the procedures available provided the plaintiff with "due process of law.  Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir.1984).

Harm to one's reputation alone is not an interest protected by the Due Process Clause. Versarge v. Township of Clinton, N.J., 984 F.2d 1359, 1371 (3d Cir. 1993) (citing Paul v. Davis, 424 U.S. 693 (1976)).  "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006).  In the public employment context, courts frequently address a deprivation of liberty employing the so-called "stigma-plus" test.  Id.  As explained by our Court of Appeals:

> [T]he "stigma-plus" test has been applied to mean that when an employer

"creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest. Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The creation and dissemination of a false and defamatory impression is the "stigma," and the termination is the "plus." When such a deprivation occurs, the employee is entitled to a name-clearing hearing.

Id. at 236.

To satisfy the "stigma" prong, the alleged stigmatizing statements must be (1) made publicly and must be (2) false. Id. (citing Bishop v. Wood, 426 U.S. 341, 348 (1976)). To satisfy the "plus" prong, an employee must be terminated or constructively discharged. Id. at 238. In short, "a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." Id.[5]

Here, the Second Amended Complaint alleges "the Defendants created publicity casting Plaintiff in a notoriously negative light . . . ," and "Defendants caused such publicity to be printed and circulated in local newspapers and through other media and means." (Second Am. Compl., at ¶¶ 42-43.)  The publicity allegedly "created the clear inference that she had abandoned her job without notice, without consideration of her duties as a public officer, without

_____

[5]Plaintiff does not advance a "classic property-based" procedural due process claim, but only the so-called "stigma-plus" due process claim.  A deprivation of liberty claim may proceed even when not accompanied by a deprivation of property claim.  Brady v. Gebbie, 859 F.2d 1543, 1553 (9th Cir.1988), cert. denied, 489 U.S. 1100 (1989); Melo v. Hafer, No. 89-2685, 1992 WL 396816, at *3 (E.D. Pa. Dec. 22, 1992) ("[F]ailure to prevail on a property claim does not bar a properly asserted liberty claim.").

10

justification, without concern for the community or the taxpayers, and with the implication of some form of wrong doing on her part." (Id. at ¶ 97.)  These allegations contain sufficient factual matter to show it was "plausible" that the publicity was false and stigmatized Plaintiff. With regard to the discharge prong, Plaintiff alleges she was constructively discharged in being told if she did not accept the severance package she would be terminated.[6]  (See Second Am. Compl., ¶ 22; Ex. A, Dkt. Entry 2.)  Thus, Plaintiff has pled an interest protected by the Fourteenth Amendment under the "stigma-plus" approach.

Defendants insist that because Plaintiff does not have an interest in her employment, they are not required to provide a pre-termination hearing.  (Br. Supp. Mot. Dismiss, Dkt. Entry 48, at 17.)  In the alternative, Defendants argue Plaintiff was provided a name clearing hearing by way of the public meeting on May 8, 2007, and the meeting between her and Reese and Linn on April 26, 2007.[7]  (Id. at 18.)

"[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (quoting Wisconsin v.

---

[6]Whether Plaintiff retired, as suggested by Defendants (see Br. Supp. Mot. Dismiss, Dkt. Entry 48, at 15), or was terminated is not a question for consideration at this stage, as the Court is required to accept the allegations of constructive discharge, which contain sufficient factual matter, as true.

[7]This alternative argument is without merit at this stage in the pleadings.  There is no indication that Ms. Erb was given the right to be heard at her meeting with Defendants Reese and Linn on April 26, 2007, or at the meeting open to the public on May 8, 2007.

Constantineau, 400 U.S. 433, 437 (1971)); see also Goss v. Lopez, 419 U.S. 565, 575 (1975) ("It is apparent that the claimed right of the State to determine unilaterally and without process whether [ ] misconduct has occurred immediately collides with the requirements of the Constitution."). Indeed, "the hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely 'to provide the person an opportunity to clear his name.'" Codd v. Velger, 429 U.S. 624 (1977); Melo v. Hafer, Civ. A. Nos. 89-2935, 89-2685, 1992 WL 396816, at *3 (E.D. Pa. Dec. 1992) ("A discharge from public employment that jeopardizes an employee's reputation, honor, or integrity gives rise to a liberty interest under the Fourteenth Amendment; and, the opportunity for a name-clearing hearing must be afforded.").

Plaintiff alleges that the Borough of Catawissa terminated her without a pre-termination hearing. (Second Am. Compl., at ¶¶ 69, 75.) Indeed, on April 26, 2007, she alleges was informed by Defendants Reese and Linn that she would be discharged from her employment if she did not quit. (Id. at ¶ 22.) Under these circumstances, Ms. Erb's constructive discharge, followed by the allegedly false publicity, implicated a liberty interest in her reputation such that she was entitled under the United States Constitution to an opportunity to clear her name by way of a name-clearing hearing.[8]

_____

[8]Defendants' argument that Plaintiff was required to request a name-clearing hearing in order to proceed with her procedural due process claim (see Dkt. Entry 48, at 18) is not supported by Third Circuit Law. See Hill, 455 F.3d at 239 n. 19.

Finally, Defendants assert that Plaintiff's remedies under the "stigma-plus" claim if she prevails are limited to a name-clearing hearing. Our Court of Appeals, however, has not yet decided whether a prevailing plaintiff is entitled to other remedies. See Hill, 455 F.3d at 236 n.15. Thus, it is possible that Plaintiff could be entitled to other remedies.

C. Wrongful Discharge Claim

As a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship. Rutherford v. Presbyterian Univ. Hosp., 612 A.2d 500, 505 (Pa. Super. Ct. 1992). "Pennsylvania law presumes that an employee serves at the pleasure of an employer and the relationship may be terminated by either party and at any time absent a specific term or duration." Rogers v. Int'l Bus. Machs. Corp., 500 F. Supp. 867, 868 (W.D. Pa. 1980) (citing Cummings v. Kelling Nut Co., 84 A.2d 323, 325 (Pa. 1951)). Pennsylvania law prescribes that at-will employment may be terminated for any reason, or no reason, provided that the termination is not contrary to public policy. Kelly v. Ret. Pension Plan for Certain Home Office, 73 F. App'x. 543, 544 (3d Cir. 2003) (citing Clark v. Modern Group Ltd., 9 F.3d 321, 327-28 (3d Cir. 1993)); see Shick v. Shirey, 716 A.2d 1231 (Pa. 1998); Lekich v. Int'l Bus. Machs. Corp., 469 F. Supp. 485, 488 (E.D. Pa. 1979) ("A discharge may be for good reason or for no reason, but not for an illegitimate reason.").

An exception to this rule exists "when the employer exercises his otherwise absolute right to terminate the employment relationship in a manner which contravenes or undermines

an important public policy." Molush v. Orkin Exterminating Co., Inc., 547 F. Supp. 54, 56 (E.D. Pa. 1982); Rogers, 500 F. Supp. at 869 (limiting employer's power to terminate if related to a violation of a <u>clear</u> mandate of public policy). "[T]he employee must point to a clear public policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision." Hunger, 670 A.2d at 175 (citing Jacques v. AKZO Int'l Salt, Inc., 619 A.2d 748 (Pa. Super. Ct. 1993)). The simple articulation of the policy, however, is not enough; the statute, constitution or judicial decision "must be applicable directly to the employee and the employee's actions." Id. "An essential element in permitting a cause of action for wrongful discharge is a finding of a violation of a clearly defined mandate of public policy which 'strikes at the heart of a citizen's social right, duties and responsibilities.'" Yetter v. Ward Trucking Corp., 585 A.2d 1022, 1026 (Pa. Super. Ct. 1991) (citing Hineline v. Stroudsburg Elec. Supply Co., Inc., 559 A.2d 566 (Pa. Super. Ct. 1989)); see Burkholder v. Hutchinson, 589 A.2d 721, 724 (Pa. Super. Ct. 1991).

"The public-policy exception is generally broken down into three categories: an employer cannot: (1) require an employee to commit a crime; (2) prevent an employee from complying with a statutorily imposed duty; or (3) discharge an employee when a statute specifically prohibits it from doing so." Diberardinis-Mason v. Super Fresh, 94 F. Supp. 2d 626, 629 (E.D. Pa. Apr. 14, 2000). Plaintiff does not allege that she was required to commit a crime or that she was prevented from complying with a statutorily imposed duty. Her allegations seem to

14

bear most resemblance to the third category.

First, Plaintiff asserts that Defendants actions are against public policy as contemplated by the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") in 42 Pa. Cons. Stat. § 8550. (Br. Opp'n Mot. Dismiss, Dkt. Entry 49, at 9.) This statute creates an exception to public official immunity in the event there is "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. This section of the PSTCA does not set forth a clear public policy similar to others recognized by courts.[9] Nor does it render criminal the actions taken by Defendants in allegedly discharging Ms. Erb. In short, an exception to public official immunity is not tantamount to a public policy recognized under the exception for wrongful discharge claims for at-will employees.

Second, Plaintiff argues that Defendants made the decision to terminate her "outside duly authorized meetings" in violation of a public policy prescribed in 53 Pa. Cons. Stat. § 45101, et seq. ("The Borough Code"), the Pennsylvania Sunshine Act, 65 Pa. Cons. Stat. § 701, et seq.,[10] and the Pennsylvania Supreme Court decision in Edsall v. Jersey Shore

---

[9]Public policy exceptions have been recognized in only extremely limited circumstances. See e.g., Field v. Philadelphia Elec. Co., 565 A.2d 1170 (Pa. Super. Ct. 1989) (employee fired for reporting a nuclear safety violation); Reuther v. Fowler & Williams, Inc., 386 A.2d 119 (Pa. Super. Ct. 1978) (employer fired employee for serving on a jury); Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363 (3d. Cir. 1979) (refusal to submit to polygraph examination); Polsky v. Radio Shack, 666 F.2d 824 (3d Cir. 1981) (results of a polygraph examination required as a condition of continued employment).

[10]Plaintiff does not cite to a specific provision of the Pennsylvania Sunshine Act

Borough, 70 A. 429 (Pa. 1908).  (See Second Amend. Compl. at pp. 19-21; Br. Opp'n Mot.

Dismiss, Dkt. Entry 49, at 9-10).  These statutes likewise fail to rise to the level of public policy

sufficient to support a wrongful discharge claim contemplated by Pennsylvania law.[11]  See

Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 175 (Pa. Super. Ct. 1996) (quoting Krajsa v.

Keypunch, Inc., 622 A.2d 355, 358 (1993)) ("The "public policy exception" to at-will employment

is used in only the "'most limited of circumstances, where discharges of at-will employees would

threaten the clear mandates of public policy.'") In Edsall, the Supreme Court of Pennsylvania

upheld the trial court's ruling "excluding testimony as to the acts of individual members of the

borough council, unless coupled with proof of express authority."  Id. at 597.  This is a far cry

from establishing a clear, defined public policy.

 The Borough Code is likewise insufficient to create a public policy violated by Plaintiff's

discharge.  53 Pa. Cons. Stat. § 46006(3), which Plaintiff cites in her opposition brief, provides:

---

[11]Plaintiff has not submitted a contract of employment that specifies a definite duration of
employment or any proof thereof.  Thus, she is presumed to be an at-will employee.  See
Violanti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1258 (M.D. Pa. 1994) ("In
Pennsylvania, there is a very strong presumption of at-will employment relationships and the
level of proof required to overcome this presumption is arduous."); Scott v. Extracorporeal, Inc.,
545 A.2d 334, 336 (1988) ("The presumption may be overcome by express contract, implied
in-fact contract (that is, the surrounding circumstances of the hiring may indicate that the
parties did not intend it to be at-will), and additional consideration passing from the employer
(that is, if the employee bestows a legally sufficient benefit or incurs a sufficient detriment for
the benefit of the employer beyond the services for which he was hired, a court may infer that
the parties intended to overcome the at-will presumption).").

> The legislative powers of boroughs including capital expenditures not payable out of current funds, shall be exercised by or be based on an ordinance. All other powers shall be exercised by vote of the majority of council present at a meeting, unless otherwise provided. Routine, ministerial or administrative purchases and powers may be made and exercised by officers or committees, if authority therefor was previously given, or if the action is subsequently ratified by council. Whenever any action by the council shall result in a specific written contract or agreement, such contract or agreement shall be signed by the president of the borough council.

Section 46006(3) of the Borough Code may impose an affirmative obligation on the Borough Council to act in a certain manner, or provide general guidelines for action, but it does not establish a clearly defined public policy. It is not apparent from Section 46006(3) that the Borough Council could not discharge an employee and subsequently hold a meeting to ratify the action. Thus, Section 46006(3) of the Borough Code cannot form a basis for a wrongful termination claim. Compare Diberardinis-Mason v. Super Fresh, 94 F. Supp. 2d at 629 (the Pennsylvania Pharmacy Act does not form the basis of a wrongful discharge claim). Indeed, the Borough Code and the Sunshine Act do not render actionable under common law the alleged discharge of Ms. Erb. See Kelly, 73 F. App'x. at 544-45 (recognizing that the Third Circuit has limited the Pennsylvania public policy exception "to when the employee objects to a course of action that the employer is taking that is clearly illegal.")

If the Court were to find the public policy exception applicable because Defendants violated the Borough Code or Sunshine Act, almost any violation of a state civil statute would afford at-will public employees a cause of action. At-will employees would then enjoy an equal

17

status with that of contracted employees, undermining the at-will employee-employer relationship.  Thus, because Plaintiff has not pointed to a specific public policy, her wrongful discharge claim will be dismissed.

D.  Fraud Claim

Defendants claim that the "gist of the action" doctrine bars Plaintiff's fraud claim.  (Br. Supp. Mot. Dismiss, Dkt. Entry 48, at 24.)  "The gist of the action doctrine's purpose is to maintain the distinction between the theories of breach of contract and tort, and it precludes a plaintiff from recasting ordinary breach of contract claims into tort claims."  Air Products & Chemicals, Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003) (citing Bash v. Bell Tel. Co. of Pa., 601 A.2d 825, 829 (Pa. Super Ct. 1992)).

Courts have held that the "gist of the action" doctrine bars tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."  Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005).  In this regard, "[t]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus."  Redevelopment Auth. v. Int'l Ins. Co., 685 A.2d 581, 590 (1996) (en banc).  In other words, the gist of the action is contractual where "the

18

parties' obligations are defined by the terms of contracts, and not by the larger social policies embodied by the law of torts." Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001).

In this case, Plaintiff has asserted claims not grounded in the contract itself.  Plaintiff contends that "[t]he individual Defendants knew that they could not bind the Defendant Borough of Catawissa to the termination of Plaintiff's employment nor could they bind the Defendant Borough of Catawissa to the offer of the aforesaid severance package, without acting" at a duly authorized meeting.  (Second Am. Compl., Dkt. Entry 42, ¶ 40.)  She further claims that she relied on the representations made by Defendants Reese and Linn that they were authorized to offer her a severance package.  (Id. at ¶ 42.)  These are allegations of fraud in the inducement of the contract, which are "much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." Air Products & Chemicals, Inc., 256 F. Supp. 2d at 340.  Thus, the "gist of the action" doctrine is inapplicable.

Defendants further claim that Plaintiff's assertions of fraud do not satisfy the heightened pleading standard envisioned by Federal Rule of Civil Procedure 9(b).  Rule 9(b) provides that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Third Circuit Court of Appeals has held that "this requirement may be satisfied by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

19

Bintliff-Ritchie v. American Reinsurance Co., 285 F. App'x 940, 944 (3d Cir. 2008) (citing Lum v. Bank of America, 361 F.3d 217, 224 (3d Cir.2004)) (internal citations omitted).

Plaintiff has satisfied the requirements of Federal Rule of Civil Procedure 9(b). She asserts that Defendants "Romania, Stewart, Sabol, Rhoades, Kashner, and Kitchen each authorized the individual Defendants Reese and Linn to inform Plaintiff that she would be discharged unless she resigned." (Second Am. Compl., Dkt. Entry 42, ¶ 26.) It is further alleged that on April 26, 2007, Plaintiff met with Defendants Reese and Linn and was offered a severance package by them. A copy of the alleged severance package is included with the original complaint. Indicia of precision and detail are present in these allegations. See Lum, 361 F.3d at 224 (requiring plaintiffs to allege "who made a misrepresentation to whom and the general content of the misrepresentation" in order to comply with Federal Rule of Civil Procedure 9(b)). Moreover, Plaintiff has alleged that on May 8, 2007, a meeting open to the public took place in which her fraudulently-induced resignation was accepted. By providing the specific dates of the occurrence of the alleged fraud, the contents of the alleged severance package, and the persons who extended the severance package to her, Plaintiff has satisfied the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).

E. High Public Official Immunity

"Pennsylvania common law recognizes the doctrine of absolute immunity for 'high public officials.'" Smith v. School District of Phila., 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000). In

Lindner v. Mollan, 677 A.2d 1194, 1195-96 (Pa. 1996), the court held that the PSTCA does not abrogate high public official's absolute immunity from civil suits for defamation arising out of the performance of the high public official's duties. Describing the scope of common law immunity, the Pennsylvania Supreme Court has stated, "absolute privilege ... is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority . . . ." Durham v. McElynn, 772 A.2d 68, 69 (2001).

Although this doctrine originated in defamation suits, see Lindner supra, the Supreme Court of Pennsylvania has stated it may be extended beyond the defamation context so long as the "high public officials'" actions were undertaken within the scope of their authority. Jonnet v. Bodick, 244 A.2d 751, 753 (Pa. 1968). Consequently, courts have predicted that the Supreme Court of Pennsylvania would extend the doctrine to include claims of "retaliatory discharge, *loss of consortium*, invasion of privacy, and intentional infliction of emotional distress."[12] Zugarek v. Southern Tioga School District, 214 F. Supp. 2d 468, 479 (M.D. Pa. 2002) (emphasis in original); see also Smith, 112 F. Supp. 2d at 425-26 (dismissing claims of defamation,

_____

[12] Commendably, Plaintiff's counsel acknowledged the existence of authority extending high official immunity to intentional torts other than defamation without Defendants having raised its application to claims besides defamation. (Plaintiff's Opp. Brief, Dkt. Entry 49, at 13 n.3.) Defendants then assert the applicability of high official immunity to all intentional torts in their Reply Brief. (Dkt. Entry 52 at 9.)

intentional infliction of emotional distress, and invasion of privacy due to high public official

immunity enjoyed by school officials); Ballas v. City of Reading, Civ. A. No. 00-CV-2943, 2001

WL 73737, at *11 (E.D. Pa. Jan. 25, 2001) (holding city mayor has an absolute privilege against

liability for state law claims of wrongful termination and loss of consortium); Poteat v. Harrisburg

School District, 33 F. Supp. 2d 384 (M.D. Pa. 1999) (finding high public officials have absolute

immunity under state law from suits of defamation, invasion of privacy, and false light).  Judge

Dubois in Smith concluded that Lindner would be extended to intentional torts other than

defamation because:

> [T]he Pennsylvania common law doctrine of absolute immunity for high public
> official's "rests upon the idea that conduct which otherwise would be
> actionable is to escape liability because the defendant is acting in furtherance of
> some interest of social importance, which is entitled to protection even at the
> expense of uncompensated harm to the plaintiff's reputation." Also significant is
> the Lindner court's statement that 'this sweeping immunity is not for the benefit of
> high public officials, but for the benefit of the public.'"

112 F. Supp. 2d at 426. In this regard, it is significant that Lindner indicated that absolute

immunity for high public officials was the only viable "means of removing any inhibition which

might deprive the public of the best service of its officers and agencies." Lindner, 677 A.2d at

1196.

I find the analysis in Smith persuasive.  Accordingly, high public official immunity will be

accorded to the individual council members.[13]  In addition, because a borough mayor has also

been regarded as a "high public official" for purposes of the common law immunity doctrine, see

Lindner, 677 A.2d at 1199, (borough mayor "clearly qualifies as a 'high public official'"), Mayor

Kitchen will also be accorded immunity from liability on Plaintiff's intentional tort claims.

Plaintiff insists that Defendants' actionable behavior was made outside of their official

duties, rendering inapplicable the high public official immunity.  (Br. Opp'n Mot. Dismiss, Dkt.

Entry 49, at 11.)  With regard to a defamation claim, in order to determine "whether Defendants'

allegedly actionable behavior was made in the course of their official duties," Osiris Enterprises

v. Borough of Whitehall, 877 A.2d 560, 567 (Pa. Commw. Ct.), the Court is required to evaluate

the following factors: "(1) the formality of the forum in which the words were spoken or

published; and (2) the relationship of the legitimate subject of governmental concern to the

person seeking damages for the defamatory utterance."  Id. at 568.

Here, the allegations do not make it "plausible" that Defendants acted outside their

official duties in allegedly defaming Plaintiff.  The defamation claim centers around

communications made on May 8, 2007, by the individual Defendants regarding Plaintiff's

resignation.  (Second Am. Compl., at ¶ 97.)  The May 8, 2007 communications were made on

---

[13]The individual Defendants, as Members of the Borough of Catawissa Council, are high public officials.  See Miller v. North Belle Vernon Borough, Civil Action No. 8-1435, 2009 WL 112854, at *6 (W.D. Pa. Jan. 15, 2009) (local councilmen are public officials); Hall v. Kiger, 795 A.2d 497 (Pa. Commw. Ct. 2002) (same); Smith v. Borough of Dunmore, Civ. No. 5-1343, 2007 WL 762930, at * 12 (M.D. Pa. Mar. 7, 2007) (same).

the same day that the individual Defendants voted in an open meeting to accept Plaintiff's alleged resignation. There are no allegations suggesting that the communication was made outside the context of official Borough Council business. Nor did the statements concern any subject matter but Plaintiff's alleged resignation. Thus, the individual Defendants are entitled to immunity as to Plaintiff's defamation claims.[14] See Osiris Enterprises, 877 A.2d 568 (affirming a finding that high public official immunity precluded a defamation claim because "(1) the statements were made in the context of a Borough Council meeting that was open to the public; and (2) the statements were made while dealing with the awarding of a public works project.").

The same conclusion is compelled with regard to the infliction of emotional stress, invasion of privacy, and false light claims. The allegations do not point to any actions taken by the officials which would be outside the scope of their official duties.[15] Indeed, Plaintiff alleges that the individual Defendants were the final authority for her employment decision and that her termination "was pursuant to a policy and custom of the Borough of Catawissa . . . ." (Second Am. Compl., Dkt. Entry 42, at ¶¶ 60-61.) Plaintiff further alleges that Defendants met together

_____

[14]Later in her Second Amended Complaint, Plaintiff claims the actions taken by the individual Defendants were outside of the scope of their authority. (Id. at ¶ 98.) Under Iqbal, however, "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." A naked assertion that the individual Defendants acted outside of their authority is insufficient and needs factual enhancement to survive a motion to dismiss.

[15]Plaintiff argues that Defendants made the decision to terminate her outside duly authorized meetings. It may be true that Defendants did not follow the proper procedure, but that is a separate issue from whether the decision to terminate her was within their official duties.

and came to an agreement before terminating her.  (Id. at ¶ 24.)  Finally, the acceptance of Ms.

Erb's supposed resignation and the denial of the severance package were done at an open

meeting for the Borough of Catawissa.  (Id. at ¶¶ 35-36.)  The logical inference to be drawn

from these allegations is that the Borough Council members acted in their official capacity.  The

Court cannot "infer more than the mere possibility" that the individual Defendants acted outside

the scope of their official duties, which is insufficient for Plaintiff's intentional tort claims to

survive.  Iqbal, — U.S. ----, 129 S.Ct. 1937, 1950.[16]

---

[16]To buttress her argument, Plaintiff relies on Ferrone v. Onorato, 439 F. Supp. 2d 442 (W.D. Pa. 2006), where the District Court adopted the Magistrate Judge's recommendation to deny the defendants high public official Immunity for the plaintiff's defamation claims.  Id. at 454.  First, the court rejected the plaintiff's argument that the PSTCA abrogated high public official's absolute immunity to civil suits for defamation related claims.  Next, the court noted that public official immunity is an affirmative defense which must be established by the defendants, citing to Gomez v. Toledo, 446 U.S. 635, 641 (1980), where the United States Supreme Court found that the defendant has the burden of pleading he acted in good faith for entitlement to qualified immunity under 42 U.S.C. § 1983, because "whether such immunity has been established depends on fact peculiarly within the knowledge and control of the defendant."  Then, without elaboration, the court found "[t]he record is not sufficiently developed to determine whether Defendants are entitled to the High Public Official Immunity . . . ."  Ferrone, 439 F. Supp. 2d at 455.

Here, in contrast to Ferrone, there is no question the individual Defendants qualify as high public officials.  Moreover, there is no requisite reasonable belief for the defendants to qualify for the high public official immunity under Pennsylvania common law, as there is for qualified immunity under 42 U.S.C. § 1983.  Under the high public official immunity established by Pennsylvania common law,  it is only a question of whether the officials were acting in their official capacity, which is not information exclusively held by the defendants.  Finally, under the new pleading standard enunciated after Ferrone, if Plaintiff fails to nudge her claims "across the line from conceivable to plausible," Twombly, 550 U.S. at 570, then dismissal of her claims at this stage is warranted.

Plaintiff's reliance on <u>Klump v. Nazareth Area School District</u>, 425 F. Supp. 2d 622 (E.D. Pa. 2006), is misplaced. In <u>Klump</u>, an action containing claims of defamation, slander, and invasion of privacy by a high school student and his parents, the court found that "plaintiffs *might* be able to prove a set of facts which would show that defendant Lesky [,the school superintendent,] is not entitled to claim immunity because he acted outside of his authority." (emphasis added).[17] The court pointed to two alleged statements by Lesky that Plaintiff alleged to be false, "which *could* be interpreted as outside of his duties." <u>Id.</u> at 630, 638 n.23. (emphasis added). By way of contrast, in this matter, a possibility that Defendants acted outside the scope of their duties is not enough to survive a motion to dismiss. Iqbal, ---- U.S. ----, 129 S.Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") In fact, there are no allegations that the communications or actions of the individual Defendants pertained to anything but the alleged discharge of Ms. Erb. Thus, she has not shown that it is "plausible" through factually rooted allegations that the individual Defendants acted outside their official duties. Accordingly, Defendants are entitled to high public official immunity and Plaintiff's defamation, invasion of privacy, false light, and intentional infliction of emotional distress claims will be dismissed.

---

[17]Notably, the "no set of facts" language in <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), upon which the District Court basis its standard of review in <u>Klump</u>, is no longer the appropriate standard.

F.  Official Capacity Claims against the individual Defendants

Plaintiff asserts in Counts III and V Procedural Due Process and First and Fourteenth Amendment claims against the individual Defendants in their official capacity.  (Second Am. Compl., Dkt. Entry 42, at 13 & 16.)  Defendants respond that these claims should be directed toward the Borough of Catawissa itself and not the individual Defendants.  (Br. Supp. Mot. Dismiss, Dkt. Entry 48, at 19.)  "Official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); see Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir.1988).

Since official capacity suits are treated as a suit against the entity, and Plaintiff does not oppose Defendants' Motion to Dismiss in this regard, Counts III and V against individual Defendants Rhoades, Romania, Reese, Linn, Stewart, Sabol, Kashner, and Kitchen, in their official capacities, will be dismissed.

III.  CONCLUSION

For the reasons set forth in the foregoing memorandum, Defendants' Motion to Dismiss will be granted in part and denied in part.  An appropriate order follows.

s/ Thomas I. Vanaskie<br>
Thomas I. Vanaskie<br>
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANET ERB,                          :
                    Plaintiff       :
                                    :
    v.                              :        3:CV-07-1961
                                    :        (JUDGE VANASKIE)
BOROUGH OF CATAWISSA, EDWARD        :
RHOADES, GEORGE ROMANIA,            :
BARBARA REESE, DOROTHY LINN,        :
DONALD STEWART, JOHN SABOL,         :
LINDA KASHNER, MAYOR HAROLD         :
KITCHEN,                            :
                    Defendants      :

## ORDER

NOW, THIS 30th DAY OF SEPTEMBER, 2009, for the reasons set forth in the

foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss (Dkt. Entry 44) is GRANTED as to Plaintiff's official

capacity claims against the individual Defendants (Counts III and V), wrongful termination claim

(Count VII), and defamation, invasion of privacy, false light, and intentional infliction of

emotional distress claims asserted against Members of the Catawissa Borough Council and the

Mayor of Catawissa (Counts IX, X, & XIII).

2. In all other respects, Defendants' Motion is DENIED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge